Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

FILED
CLERK, U.S. DISTRICT COURT
AUG 11 2005
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>EFRAIN SANDOVAL-OCHOA,<br>  aka "Chito,"<br>ADRIAN AMMONS,<br>  aka "Ray,"<br>ARMANDO OCHOA,<br>  aka "Mando,"<br>  aka "Cousin,"<br>SHANNON KATHLEEN HART,<br>MARTHA OCHOA,<br>TERRENCE MARVELL ROBERSON,<br>and<br>LUIS MANUEL NAVARRO,<br>  aka "Luigi,"<br><br>Defendants. | CASE NO. CR 05-0012 RGK<br><br>**ORDER RE: DEFENDANT SHANNON KATHLEEN HART'S MOTION TO SUPPRESS EVIDENCE** |

ENTER ON ICMS
AUG 11 2005

## I. INTRODUCTION

Defendant Shannon Kathleen Hart ("Hart") has moved to suppress cocaine that the government found in her possession. The government suspected that Hart was involved in criminal activity. The government stopped her vehicle, questioned her, and seized cocaine from her vehicle after a police canine alerted to the vehicle's spare tire. Hart makes this motion "on the ground that

the seizure following a routine traffic stop was within a prolonged and unlawful detention not founded upon reasonable suspicion and the search subsequent thereto [was] without benefit of probable cause." (Def.'s Mot. at 2.) In opposition, the government argues that the collective knowledge of the investigating officers provided the reasonable suspicion needed to justify the traffic stop and the probable cause required to search Hart's vehicle. (Pl.'s Opp'n at 10, 21.) In support, the government has provided deposition testimony from three of the investigating officers. (*Id.*, Ex. A, B, C.) Hart has failed to either file a reply brief or to provide any evidence contradicting the government testimony. Both parties have agreed to submit this Motion on the briefs and supporting documents without a hearing. The Court has fully considered all arguments and the evidence presented. For the following reasons, the Court denies Defendant's Motion.

## II.  FACTUAL SUMMARY

Based on the government's submitted evidence, the Court finds the following facts to be true and accurate for the purposes of this Motion.

### A.  The Preliminary Investigation

Law enforcement officers were investigating a possible drug trafficking organization apparently headed by Hart's co-defendant, Efrain Sandoval-Ochoa ("Sandoval-Ochoa"). (Wagner Decl. ¶¶ 1-2.) As part of the investigation, the government obtained a court-approved wiretap on Sandoval-Ochoa's telephone. (*Id.* ¶ 2.) The government intercepted conversations between Sandoval-Ochoa and "Ray" (co-defendant Adrian Ammons), which led officers to conclude that "Ray" was sending payment for drugs to Sandoval-Ochoa through USPS Express Mail. (*Id.* ¶ 3.) The officers obtained a warrant to search the package and found $7,250 in money orders. (*Id.*) The officers repackaged and delivered the money orders to Sandoval-Ochoa. (*Id.*)

"Ray" called Sandoval-Ochoa from Indiana and told him that "they" were "past Flagstaff" and that it would take them a few hours to reach Los Angeles. Sandoval-Ochoa told him to have them go straight to the hotel and "marinate" there. Sandoval-Ochoa said that he would "get with them" in the morning. Officers interpreted this call to mean that drug couriers were on their way to meet with Sandoval-Ochoa. (*Id.* ¶4.)

The next morning, "Ray" called and asked if Sandoval-Ochoa was ready. Sandoval-Ochoa asked "where they at?" "Ray" said that they were at "the Quality." Sandoval-Ochoa said that they may have to stay for another night. Officers interpreted this conversation to mean that the drug couriers were staying at the Quality Inn, and that the drug transfer was delayed. (*Id.* ¶ 5.)

Later that morning, "Ray" again called Sandoval-Ochoa. During this conversation, Sandoval-Ochoa said that "if worse came worst" he would "get another Heezie," but he could not get a "whole one." Also, he would "have to grab another hald just in case he do start tripping." Officers interpreted this call to mean that Sandoval-Ochoa was having difficulties with his supply of drugs, but that he could at least supply 1/2 kilogram of cocaine. (*Id.* ¶ 6.)

Shortly after noon, "Ray" and Sandoval-Ochoa spoke on another intercepted call. Sandoval-Ochoa said he was trying to get "a whole half-pound more." "Ray" told him that "expenses" were "killing us." "Ray" stated he had promised to give them "35" plus expenses for the "up and back." Based on their experience, officers concluded that "Ray" was telling him that the couriers were promised $3,500 plus expenses to transport the drugs. (*Id.* ¶ 7.) About an hour later, they spoke again, discussing how much the deal was worth. (*Id.* ¶ 8.)

A few minutes later, they again spoke on the phone. "Ray" said that the room number was ten-fourteen. Sandoval-Ochoa said that he was picking up "my little cousin" so that he "could help, you know, get with that witch." Sandoval told "Ray" that was "already on Century." Officers

3

interpreted the call to mean that the couriers were in room 1014 of the Quality Inn on Century Boulevard, and that "Ray" was picking up co-defendant Armando Ochoa to help with Hart. (*Id.* ¶ 9.)

Agents observed Sandoval-Ochoa pick up a Hispanic male, later identified as Armando Ochoa. The agents next watched them drive to the Quality Inn parking lot, and saw a woman later identified as Hart leave room 1014 and walk towards Sandoval-Ochoa's truck. (*Id.* at 10.)

Sandoval-Ochoa called "Ray" and said that he was at the truck, and to "tell her to bring down the keys like so that I can keep it pushing." He said, "I'm right next to it so she could just walk to the truck." (*Id.* ¶ 11.) Later, Sandoval-Ochoa called "Ray" again and asked if "she" was coming down. Then, he said "she right here, I'm trippin." Officers interpreted this to mean that Sandoval-Ochoa had located Hart. (*Id.* ¶ 12.)

Officers observed Sandoval-Ochoa leave in his truck about twenty minutes later. (*Id.* ¶ 13.) Later, "Ray" called again and asked if everything "was cool." Sandoval-Ochoa said that it was. Officers interpreted the call to mean that the cocaine was ready. (*Id.* ¶ 14.) In another call, Sandoval-Ochoa said that he was "taking it to her." "Ray" asked what was "inside the kitten." Sandoval-Ochoa said "thats all we got" and that "the [expletive] started tripping on the one he let use borrow." Sandoval-Ochoa said "then we got two," "and we give folks, you know - those two." Officers interpreted this conversation to mean that Sandoval-Ochoa was delivering only two kilograms of cocaine to Hart, and was unable to get any more. (*Id.* ¶ 15.)

Later, officers saw Sandoval-Ochoa return to the Quality Inn parking lot in his truck. Armando Ochoa followed him in a 2003 Chevrolet Avalanche. (*Id.* ¶ 16.) Sandoval-Ochoa called Armando Ochoa and told him where to park the Avalanche. He told Armando Ochoa to "get the

4

ticket so that you could give it to her with the keys." Armando Ochoa said he left it and that she would see it "when she hops in the truck." (*Id.* ¶ 17.)

Agents saw Hart leave room 1014, meet Sandoval-Ochoa in the parking garage, then walk to a nearby restaurant. Then, Sandoval-Ochoa and Armando Ochoa left together in Sandoval-Ochoa's truck. (*Id.* ¶ 18.) Officers interpreted these actions, combined with the telephone intercepts, to mean that Sandoval-Ochoa and Armando Ochoa got the keys to the Avalance from Hart and took it to where they had the drugs. Then, they hid the drugs in the Avalance and returned it to the Inn. (*Id.* ¶ 19.) A supervising agent directed other officers to maintain surveillance of the Avalanche and of Hart, and to have the California Highway Patrol ("CHP") conduct a traffic stop of Hart at the appropriate time. (*Id.* ¶20.)

Officers observed Hart leave the hotel in the Avalanche at 3:45 A.M. the next day. Officers followed Hart until the CHP conducted a traffic stop two hours later. (*Id.* ¶ 20; Bolon Decl.)

**B.     The Traffic Stop and Search**

CHP Sergeant Greg Wilks contacted CHP Officer Ron Bolon early that morning. (Bolon Decl. ¶¶ 1-2.) Sergeant Wilks told Officer Bolon that a green 2003 Chevrolet Avalanche was heading north on Interstate 15. Sergeant Wilks asked Officer Bolon to stop the vehicle "if [he] observed [a] reason to do so." Officer Bolon had his trained narcotics-sniffing dog "Roxy" with him. (*Id.* ¶ 2.)

At about 5:30 A.M., Officer Bolon noticed a green 2003 Avalanche traveling at about 80 miles per hour. The Avalanche was driving north on Interstate 15 in a construction zone (a violation of California Vehicle Code Section 22350). Officer Bolon pulled over the Avalanche. (*Id.* ¶3.)

1  Officer Bolon told the driver, Hart, he had stopped her for speeding in a construction zone
2  and asked for her driver's license, registration, and proof of insurance. Hart apologized and gave
3  Officer Bolon her driver's license. Officer Bolon took it back to his car to write her a citation for
4  speeding. (*Id.* ¶ 4.)

6  Officer Bolon ran a check through CHP dispatch, who advised him that Hart's driver's
7  license was valid, but that there was no record for the vehicle. Officer Bolon told Hart that there was
8  no record for the Avalanche, and that he would have the check the Vehicle Identification Number
9  ("VIN"). He told Hart that she must exit the Avalanche and step in front of it while he checked the
10 VIN. (*Id.* ¶ 5.)

12 "Hart immediately became extremely nervouse and states that she was anemic and that it was
13 too cold." Hart told Officer Bolon he could just check the VIN while she was in the car, and that she
14 would be okay. (*Id.*) "After several minutes of discussion," Hart finally got out of the Avalanche and
15 started to walk in front of it. Officer Bolon saw her put something in her pocket, which she said were
16 her keys. (*Id.* ¶ 6.)

18 Officer Bolon asked Hart if she had locked the Avalanche. She said "no." However, the
19 Avalance door was locked. Officer Bolon asked her for the keys. Hart took the keys out and pushed
20 the remote unlock button, and said that it was open now. However, it was still locked when Officer
21 Bolon again tried the door. Finally, Hart gave him the keys and he unlocked the door to check the
22 VIN. During this time, Officer Bolon noticed that Hart "would not stand still" and "appeared to be
23 very nervous." (*Id.*)

25 At some point, Sergeant Wilks arrived at the scene. "Based on Hart's bizarre behavior" and
26 on his training and experience, Officer Bolon believed that Hart was involved in illegal activity. He
27 told her to sit in Sergeant Wilks's patrol car. Hart said that "it was not that cold, and that she would

be okay standing outside by her vehicle." After discussing this for "several minutes," Hart walked back and sat in the rear seat of Sergeant Wilks's vehicle. She was not handcuffed. Officer Bolon had her sit there "for her own safety" and for the officers' safety, so that "Roxy" could inspect the Avalanche. (*Id.* ¶ 7.)

Officer Bolon had Roxy do "an exterior sniff" of the Avalanche. Roxy "showed a change of behavior at the right rear wheel well and the vehicle's truck bed." Then, Officer Bolon put Roxy in the Avalanche. She showed another change of behavior behind the driver's sear, at the floorboard. Based on his training and experience, Hart's behavior, and Roxy's reactions, Officer Bolon suspected that there were drugs or weapons inside the Avalanche. (*Id.* at 8.)

Sergeant Wilks and Officer Bolon then searched the vehicle "by hand." Sergeant Wilks looked under the Avalanche and noticed that the spare tire appeared to have been recently removed. Officer Bolon removed the spare tire and "bounced it on the ground." He heard "a solid object moving inside the spare tire." (*Id.* ¶ 9.) Officer Bolon put the valve stem of the tire near Roxy and let some air out of the tire. Roxy showed a "sudden change of behavior." Officer Bolon let more air out of the tire, and Roxy "alerted to the valve stem." Officer Bolon cut open the spare tire and found a package of cocaine. (*Id.* ¶¶ 10-11.) Officer Bolon then placed Hart under arrest. (*Id.* ¶ 12.)

### III. APPLICABLE FOURTH AMENDMENT LAW

Although this is Defendant's Motion, the government bears the burden of proving that the search and seizure was legal. *See United States v. Mendenhall*, 446 U.S. 544, 557 (1980). An officer must have a "reasonable suspicion" that a suspect is engaged in criminal conduct before stopping that suspect's vehicle in a traffic stop. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also Florida v. Royer*, 460 U.S. 491, 499 (1983); *Terry v. Ohio*, 392 U.S. 1 (1968). The officer's

reasonable suspicion can only be formed from "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the person detained is engaged in criminal activity." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (internal quotations and citation omitted). This justification must be more than a "hunch," but need not rise to the level of probable cause. *United States v. Sololow*, 490 U.S. 1, 7 (1989).

The reviewing court must look at the "totality of the circumstances" present in each case to determine if the officer had the reasonable suspicion needed to justify the traffic stop. *See id.* In a situation involving multiple officers, the Court must consider the collective knowledge of the investigating officers when determining if they had the requisite reasonable suspicion. *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1996); *see also United States v. Hensley*, 469 U.S. 221, 233 (1985) (holding that an officer may objectively rely on another agency's information so long as that agency "possessed a reasonable suspicion justifying a stop and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department").

Even if there were a valid traffic stop, the officers may not hold the suspect indefinitely. The length of the stop must be "reasonably related in scope to the justification for their initiation." *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *see also Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005). An officer may expand the scope of the stop only if new suspicious factors develop. *See United States v. Perez*, 37 F.3d 510, 512 (9th Cir. 1994). Additionally, "these factors must be 'particularized' and 'objective.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)) (internal citation omitted).

Generally, police officers may use "a well-trained narcotics-detection dog--one that 'does not expose noncontraband items that otherwise would remain hidden from public view'--during a lawful traffic stop." *Caballes*, 125 S. Ct. at 838 (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). "A dog sniff conducted during a . . . lawful traffic stop that reveals no information other than the

location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.*

## IV. ANALYSIS

The totality of the facts and circumstances in this case show that the government's actions were justified.

### A. The Traffic Stop was Justified

Officer Bolon observed Hart speeding in a construction area, which is ample justification for an investigatory traffic stop. *See United States v. Gutierrez-Mederos*, 965 F.2d 800 (9th Cir. 1992).

### B. The Drug Sniff was Justified

Even absent the preliminary investigation by other officers, Officer Bolon could point to several objective and particular factors that justified expanding the scope of the traffic stop. *See Perez*, 37 F.3d at 512. The Avalanche registration check indicated that there was a problem with the vehicle's VIN (the Avalanche may have been stolen). Also, Hart refused to get out of the Avalanche until after a long discussion, she locked the door when she got out, and she acted very nervous. Her behavior was consistent with someone involved in a criminal activity. The combined effect of this evidence was that Officer Bolden had justification to do an exterior drug sniff of the vehicle even if the Court disregards the preliminary investigation by other officers.

However, when looking at the combined knowledge of all officers at the time, there is no doubt that the government was justified in conducting a dog sniff of the Avalanche. The agents had

formed a reasonable suspicion that Hart was a drug courier based on their surveillance and the information gleaned from the wiretap. This information, when combined with Hart's behavior at the stop, and the fact that the Avalanche's registration was suspect, forms a reasonably objective and particularized reason to do a dog sniff of the Avalanche.

### C. The Search of the Spare Tire was Justified

Finally, it was reasonable to look under the Avalanche and examine the spare tire because Roxy and showed a change of behavior in that area. It was reasonable to remove the spare tire and have Roxy do a closer inspection because the spare tire looked as if it had been recently removed. When Roxy alerted to the air coming from the tire, and given that is sounded as if a solid object was in the tire, it was reasonable to cut open the spare tire.

Additionally, there is no indication that the officers delayed Hart for an impermissible length of time while conducting the traffic stop, drug sniff, and search of the tire. The testimony indicates that Hart caused some delay by refusing to follow reasonable instructions. Additionally, the officers expanded the length of the stop beyond that of a normal traffic stop based on the same factors discussed above. Their methodology was reasonable and was a graduated response to the circumstances presented. *See United States v. Place*, 462 U.S. 696, 709 (1983); *United States v. Mayo*, 394 F. 3d 1271, 1276 (9th Cir. 2005).

10

## V. CONCLUSION

Based on the foregoing, Defendant Hart's Motion to Suppress is **denied**.

DATED: AUG 1 1 2005

R. Gary Klausner, Judge
United States District Court